## Case No. 11,327.

### POTTER et al. v. FULLER.

[2 Fish. Pat. Cas. 251.] [1]

Circuit Court, S. D. New York. June, 1862.

INJUNCTION IN PATENT CASES—INFRINGEMENT BY SELLING — IRREPARABLE INJURY — VALIDITY OF PATENT — SENDING CASE TO JURY — VERDICTS WITHOUT CONTEST.

1. Where machines were not manufactured by the defendants, but were sold by them as agents of the maker, an injunction against such selling is not such an irreparable injury as could prevent the issue of the writ.

2. Where the validity of the patent is fully established, and the infringement is clear, a party has a right to protection by injunction, although it may cause great injury to the infringer.

[Cited in Hodge v. Hudson River R. Co., Case No. 6,560.]

3. The tendency of the courts in equity, as evinced in their decisions, both in England and America, for the last few years, has been to consider cases, arising under letters patent, themselves, upon full proof, instead of sending them to a jury.

4. There is no reason why parties, all of whom are interested in a patent, may not make a common fund for the purpose of protecting their common rights, by prosecuting those who, they think, have infringed them.

5. While a decision in a former case is conclusive only upon the parties to the litigation, it may be an adjudication upon the points in issue, so far as the validity of the patents is concerned, which is entitled to great weight in other cases, and which any court, upon a motion for a preliminary injunction, would, with extreme reluctance, attempt to overrule.

[Cited in Edison Electric Light Co. v. Electric Manuf'g Co., 57 Fed. 619.]

6. If verdicts are obtained without contest—without collusion—because the defendants chose to yield to a judgment, as much weight should be given to such verdicts as if there had been a full trial, and a jury had passed upon the facts.

[Cited in McWilliams Manuf'g Co. v. Blundell, 11 Fed. 422.]

In equity. This was a motion [by Orlando B. Potter, Nathaniel Wheeler, and others] for a preliminary injunction to restrain the defendant [Abraham Fuller] from infringing reissued letters patent, Nos. 346 and 414, for improvements in sewing machines, granted to Allen B. Wilson, and more particularly referred to in the report of the case of Potter v. Wilson [Case No. 11,342]. The defendant was selling what was known as the "Williams & Orvis" machine, in the Southern district of New York, as an agent of the manufacturers, who constructed the machines in Massachusetts.

George Gifford, for complainants.

Blatchford, Seward, & Griswold, for defendant.

Before NELSON, Circuit Justice, and SMALLEY, District Judge.

SMALLEY, District Judge. The bill is predicated upon two reissued letters patent to A. B. Wilson, one marked "346," dated

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

January 22, 1856, and the other marked "414," dated December 9, 1856. All the right, title, and interest which Wilson had to this invention and patent have passed, by various assignments duly executed, to the orators. The title of the orators to these Wilson reissued patents is not denied. The bill, among other things, states that after the orators became the owners of said letters patent and the inventions therein described, and after the said reissues, the said reissue marked "346" was infringed by one Joel Chase, and his confederates, in the city of New York, by the manufacture of sewing machines, and the orators caused a suit in equity to be commenced against him in the United States circuit court for the Southern district of New York, and an application to be made to said court for an injunction to issue against him; that on or about September 27, 1856, an injunction was issued by said court, restraining and enjoining the said defendant Chase, and his confederates, from further infringement of said patent; that afterward, certain persons, seeking to possess themselves of the advantages of said invention, had prepared for and commenced the manufacture of sewing machines in the state of Connecticut, differing considerably from the inventions of said Wilson, but employing some parts thereof—the orators caused actions at law to be instituted against said persons in the circuit court of the United States for the district of Connecticut, to establish the validity of said patents, and to recover damages for the infringement thereof: that the defendants in said actions appeared by counsel, and the plaintiffs proceeded without delay to prepare for the trial of the same at the first term thereafter of said court, that is, the April term of 1858, and at that term obtained verdicts and recovered damages therein. That the validity of said patents to Wilson, and the utility of his inventions, and the exclusive rights secured thereby, were acknowledged and acquiesced in by all said defendants and the public to a large extent, and the same were thereby established.

But thereafter, in other suits in equity in said court, on applications for preliminary injunctions, some of the defendants not appearing to be satisfied with the adjudications already had, defended, and set up, and urged by their counsel in opposition to such applications, that the complainants had not sufficient title to said patents; that the subject-matter of some of the claims was not patentable; that the inventions made by the patentee were not useful, and that he was not the first or the original inventor of what is claimed in said patents; that said reissued patents were void, because said A. B. Wilson had no right to apply for the same, and because they are not for the same invention as was the original: also, that said inventions, or substantial parts thereof, had been anticipated by inventions of Thimonier,

of France; Elias Howe, Jr., Bradshaw, Walker, Bachelder, Sewell, Carpenter, and others. Long and elaborate arguments were had, and the court, after full deliberation, overruled all of said objections, and all matters which were set up in defense, and about the last of December, 1858, granted and issued injunctions against the defendants.

That in the month of February, 1859, more than twelve preliminary injunctions were granted and issued by the United States circuit court for the Southern district of New York, against infringers of said patents. That subsequently thereto a motion was made to dissolve one of said injunctions, and the motion, after a hearing thereof by the court, was denied, and the injunction was continued.

That in the year 1858, suits in equity were brought upon said patents in the circuit court of the United States for the Southern district of New York, against James G. Wilson and others, also against John R. Gibbs; and in December, 1858, another suit in equity was brought against George B. Sloat and others for infringements of said patents. That in the month of February, 1859, preliminary injunctions were granted and issued by the court against the defendants in said suits; that the defendants, in their answers in said last three suits, set up as a defense therein most of the matters which had been set up in the suits in the district of Connecticut; and in addition thereto, they alleged in their answers that the English patents issued to John Fisher and James Gibbons, Edward Newton and Thomas Archbold, James Cropper, John Brown Milnes, and the American patents issued to William H. Akins and Jacob D. Felthousen, dated August 5, 1851, and the patent to William H. Johnson, dated March 7, 1854, and the caveat of said William H. Johnson, filed November 7, 1848, contained the inventions, or substantial and material parts thereof, patented in and by said two reissued patents to said Allen B. Wilson; and that said inventions of said Wilson, and substantial and material parts thereof, patented by said two reissued patents to said Allen B. Wilson, had, prior to the invention of said Allen B. Wilson, been made by and was known to and used by said Akins and Felthousen, Leander W. Langdon, William H. Johnson, and divers other persons in the United States. That general replications were filed by the complainants to said answers, denying said allegations, and a large quantity of testimony was taken in said suits preparatory for final hearing on pleadings and proofs, commencing about January 1, 1859, and ending about November 14, 1859, and amounting to over eighteen hundred pages in print. That said suits were brought to a final hearing on pleadings and proofs, before Justice Nelson, Judge Smalley sitting with him, on June 20, 1860, and were argued by counsel on both sides, the arguments continuing for about two weeks. Aft-

er the arguments were closed, the court held said suits under advisement until about August 17, 1860, when Justice Nelson rendered the decision of the court in said suits, overruling the defenses set up by the defendants therein, and deciding that said Allen B. Wilson was the first and original inventor of all that is claimed in said patents, or either of them, and that said patents are both good and valid, and that the same had been infringed by all the defendants in said suits, and ordered an account from said defendants, and each of them, and that perpetual injunctions be issued against all of said defendants in said suits. And that on October 4, 1860, a final decree was entered by the court against the defendants in each of said suits, adjudging and decreeing that said two reissued patents are good and valid; that said Allen B. Wilson was the original and first inventor of the improvements thereby secured; that the complainants in each of said suits, by virtue of said patents, and by the assignments alleged in the bill of complaint in each of said suits, were vested with the exclusive rights and privileges granted and secured in and by said patents and each of them; that the defendants in each of said suits had infringed upon said patents and each of them, and the exclusive rights of orators under the same; and also adjudging and deciding that the complainants in said suits should recover of the said defendants therein the gains, advantages, and profits which had arisen or accrued to the defendants therein respectively from their infringements of said patents, and each of them, together with the cost of the complainants in said suits; and also that a perpetual injunction be granted and issued against the defendants in each of said suits; and ordered a reference to a master of said court to take account of the same.

The bill further states, that a like final decree was entered by the said court on November 5, 1860, in another suit upon said two reissued patents, wherein Louis Planer and Joseph Anger, of the city of New York, were defendants, and against whom a suit had been brought in said court for the infringement of said patents.

And also, that a like final decree was entered by said court on December 4, 1860, in another suit upon said two reissued patents, wherein James Harrison, Jr., of the city of New York, was defendant, and against whom a suit had been brought in said court for the infringement of said patents. The bill further states, that after the orators became the owners of said letters patent and inventions as aforesaid, and after the reissues 346 and 414 above named, the same were at various times and at divers places infringed by Isaac F. Shepard, and many others who are named in the bill, in the district of Massachusetts, by the manufacture and sale of sewing machines; and the orators caused suits in equity to be commenced against them in the United States

circuit court for that district, and applications to be made to said court for injunctions to issue against said defendants. And such proceedings were thereupon had, that perpetual injunctions were duly ordered to issue by said court, restraining and enjoining all of said defendants and their confederates from further infringement of said reissues.

And the bill further states, that in the month of October, 1860, several suits in equity upon said patents were pending in the circuit court of the United States for the Eastern district of Pennsylvania; that the defendants had appeared by counsel in each of said suits, and put in answers therein; and in their answers respectively had set up as defense, among other things, the various matters of defense which had been set up by the defendants in the above-mentioned suits, in the Southern district of New York, and in the district of Connecticut; that replications were filed to said answers, denying said allegations; and testimony was taken in said suits preparatory for final hearing thereof; and that in or about the month of October, 1860, said suits were brought to a final hearing on pleadings and proofs before his honor, Justice Grier, at Philadelphia, in said district, and final decrees were granted and entered therein overruling all the defenses set up by the defendants in said suits, and adjudging and decreeing that said Allen B. Wilson was the first and original inventor of all that is patented in and by said patents, or either of them; and that said patents are good and valid; and that the complainants owned the same; and that the said patents had been infringed by all the defendants in said suits, and ordered and decreed an account from said defendants and each of them, and that perpetual injunctions be issued against all of said defendants in said suits.

These are the material facts stated in the bill. They are sustained to some extent by the affidavits of four machinists and experts in relation to the question of infringement.

Now, if the defendant's machine is found upon examination to infringe these patents, it is obvious that the bill makes a clear and strong case for an injunction. And certainly the orators are entitled to an injunction unless the evidence and exhibits, introduced by the defendant, defeat that right. That the defendant's machine has infringed, and that the one they are now selling is an infringement of said reissued patents, and each of them, in defiance of the rights of the orators, by using and vending to others to be used the inventions therein described, is claimed to be proved by the testimony of four experts and machinists, whose affidavits are attached to and read in support of the bill, and who testify that the defendant has been and is still using, or selling rather, machines similar in principle and operation to those described in the specification of said Wilson's reissued patents.

The defendant resists this application for a preliminary injunction on four grounds. First,

he says, that this is not a case where a preliminary injunction should issue, even if it be true that the Wilson patents are valid, and if it should turn out upon a hearing in chief that the defendant's machine is an infringement; for, he says, first, that to grant a preliminary injunction would produce irreparable injury to the defendants. It is difficult to see how that objection can well be sustained in this case, even if such a fact would be good cause for withholding a preliminary injunction; for, it appears from the case that these machines are not being manufactured in New York; that they are only being sold here by an agent for the manufacturers, Williams and Orvis, who construct them in Massachusetts. Therefore, there is not much force in the objection that a preliminary injunction in this case would produce irreparable injury, if it be really an infringement of these patents, by simply enjoining them from selling in the Southern district of New York. Besides, where the validity of the patent is fully established and the infringement is clear, a party has a right to protection by injunction, although it may cause great injury to the infringer.

Another objection that is urged is, that the plaintiffs are not entitled to a preliminary injunction, because they have been guilty of great laches; and as evidence of these laches, defendants asserted in the affidavits filed by them and proved by records, that certain suits had been commenced against "Williams and Orvis," in the district of Massachusetts, for a violation of the Wilson patents in the manufacture and vending of the same machines sold by the defendant. The court is not disposed to regard that claim favorably. It is said that the parties have had an opportunity in that district to bring these matters to issue before a jury, and therefore that a preliminary injunction should not issue. It is unquestionably true that in former years it has been much the practice of the courts, in adjudicating upon patents, when there was a seriously-disputed question of fact, to send the matter to a jury. But I think the tendency of the courts, as evinced by their decisions, both in England and America, for the last few years, has been to consider the cases themselves upon full proof, instead of sending them to the jury. And I believe that the decision of a competent court, accustomed to the investigation of facts of this kind in relation to matters of art and science, would be more satisfactory to intelligent minds than the verdict of a jury would be likely to be. There is usually a great mass of evidence put in (and it has been shown, in this case, that a similar one in Boston occupied fifty-eight days in trial before the jury). The jurors, at least many of them, are not accustomed to investigations of this character, their minds become fatigued, their recollection of the testimony imperfect, and few, if any, take minutes of the evidence. For these reasons, and others not necessary to mention, I am inclined to think that the decision of a court of equity, upon a full investiga-

tion of the facts, is, and ought to be, more satisfactory than the verdict of a jury under such circumstances. And after this question of the validity of these patents has been once adjudicated, as it appears from the bill, and is conceded by the defendant in the argument that it has, and after it has been again examined, I should hesitate long before I would listen to the argument that the injunction should not issue because a jury has not passed upon the case. I think, therefore, that that objection is not well founded.

The third reason urged by the defendant why an injunction should not be granted in this particular case, is alleged to be on account of the oppressive conduct of the plaintiffs. That is said to consist in the fact, which appeared in the evidence by the affidavits and the papers, that the various parties in interest in these Wilson patents, the three classes of orators here, had agreed among themselves that they would make a common fund to prosecute infringements upon these patents, and thus protect their rights. This it is alleged, is a combination, oppressive in its character, which ought to be frowned upon by the court. But I can see nothing improper in the transaction. It does not appear that any parties entered into that arrangement who were not themselves interested in those patents; and why they might not make a common fund for the purpose of protecting their common rights by prosecuting those they thought had infringed them, I am at a loss to conceive. I can see no objection to the injunction, therefore, upon that ground.

The second ground on which the defendant resists the application is, that there has been no general acquiescence in the validity of these patents, and that the former adjudications upon them, which are set forth in the orator's bill, were based upon erroneous propositions; that Judge Ingersoll, in granting the injunction in the case of Potter v. Holland [Case No. 11,330], in Connecticut, was led to believe three erroneous propositions, which are now shown to be erroneous. These three errors, the defendant insists, consist in this: First. That Judge Ingersoll supposed that the Wilson machine of 1850 was capable of producing the result claimed for it by the patentee; Secondly. That the feeding instrument was a combination of two elements, namely, of the feeder and presser only, whereas, in fact, it is a combination of three elements. As to these two questions, the defendant claims that Judge Ingersoll committed a serious error in the hearing before him (which appears to have been elaborately argued and carefully considered), and that the same errors were sustained by the court in deciding the case of Potter v. Wilson [Id. 11,342], at Cooperstown, decided by Judge Nelson, heard before Judge Nelson and myself; that Judge Ingersoll first made the mistake, and the full bench followed him. It is sufficient to dispose of that position by saying that inasmuch as it has been once passed upon, after being fully argued before the late Judge Ingersoll, certainly an eminent patent law judge, and by the full bench, Mr. Justice Nelson presiding, it would hardly be presumed that this court, on a motion for a preliminary injunction, would attempt to reconsider and overrule those decisions, made after such full consideration. In addition to that, though there has been much time spent upon these propositions, I have yet to see any reason to believe that the first ruling of Judge Ingersoll, sustained by Judge Nelson and myself, was not correct.

The third reason which the defendant assigns, is a question of fact. That Wilson was not the first person who invented any feeding instrument by which the cloth could be fed automatically, while the direction of the seam could be changed at the will of the operator, without interfering with the regularity of feed. All the machines that the defendant now relies upon to sustain that proposition were before Judge Ingersoll, it appears, and again before the full court at Cooperstown, in 1860, except Ellithorpe's machine, which I shall consider more hereafter. That disposes of the three objections made by the defendant upon that point.

Then the inquiry returns, what weight and consideration ought to be given to those various adjudications in Connecticut, the Southern district of New York, in Massachusetts, and in Pennsylvania? It is stated in the bill, and not denied by any affidavit (no answer having been put in), that the case was very fully heard on the final trial in June, 1860; that the argument occupied some twelve days, and the testimony produced to the court occupied over eighteen hundred printed pages, that it received a full consideration, and that a final decree was made. Now, it is undoubtedly true that as this defendant, and as "Williams and Orvis," whose machines this defendant is selling, were not parties to any of those suits, that decision is not conclusive upon them; but is it not an adjudication upon the points in issue, so far as the validity of these patents is concerned, which is entitled to great weight, and which any court, sitting as this court now does, hearing a motion for a preliminary injunction, would, with extreme reluctance, attempt to overrule? In addition, it seems that in Connecticut various suits were brought and verdicts obtained. An affidavit, produced by the defendant, tends to show that those verdicts were not obtained upon trial, but by consent. But Judge Ingersoll, who was holding the court when those verdicts were rendered, states, in his opinion, that they were rendered without collusion; the suits were fully contested, although, before they went to trial, the parties defendant yielded to a verdict agreeing to the damages. Under those circumstances, the defendant says,

those verdicts are not entitled to any consideration. I take a very different view of the question.

If, as Ingersoll, District Judge. states—and certainly we are bound to take his statement as correct—the suits were without collusion, were honestly defended, and finally, the defendants only yielded to a judgment when it was evident that the contest could not be sustained, I think the evidence is quite as strong in favor of the propriety of those verdicts, and quite as much weight should be given to them, as if there had been a full trial and a jury had passed upon the facts; because it would indicate decidedly that the defendants and their counsel (and the papers show that they were eminent counsel—some of the first members of the bar), after a full examination of the facts in the cases, came to the conclusion that they could not be successfully defended, and, therefore, did not choose to risk a verdict of the jury upon them. It is said, as to those cases in Massachusetts, there were no trials, but decrees were entered by consent, and so also in the cases before Justice Grier. There is no evidence in either of those cases that there was any collusion, and, in the absence of evidence. certainly the presumption is that there was none. These objections, therefore, to the force that should be given to the previous adjudications, we think can not be sustained.

The defendant claims, among other things on this present hearing, that Wm. H. Johnson was the first inventor of the four-motion feed, and that Wheeler & Wilson's four-motion feed was an infringement of Johnson's; and he insists that it was so determined by the jury in the case recently tried in Massachusetts—Johnson v. Root [Case No. 7,409]. The answer to this objection is contained in one paragraph, in Judge Nelson's opinion, delivered in the case of Potter v. Wilson [supra], before referred to. Judge Nelson's last proposition was this: "It is further insisted that the device described in the caveat filed by Wm. H. Johnson, November, 1848, and in the patent issued to him 7th March, 1854, contains the principle of this improvement of Wilson; but it is only necessary to read the description and examine the model of this machine to see that the device has no resemblance to that of Wilson in this improvement in question." That would seem, therefore, to very effectually dispose of the claim that Johnson was the original inventor.

The defendant now produces, however, and relies, as he states, upon two inventions prior to Wilson, which have not been before presented, as it is claimed, to any court. One is that of Solomon B. Ellithorpe. invented and reduced to practice, as is asserted, in 1847. To establish this position, the defendant relies upon the affidavits of Ellithorpe, Marsh, and an exhibit, and copies of drawings from the patent office. I have looked into those affidavits very attentively.

This subject of Ellithorpe's invention is not new to me; it was before me some eighteen months ago, in a question of injunction, and passed upon. Without any reference to that decision, however, I am disposed to review the evidence now before the court, and see if this position can be maintained. It appears, from Ellithorpe's affidavit (which is certainly very adroitly drawn), which has been read in the case, that he was, from 1841 up to 1847, living in Albany; that he was an apprentice at the hatter's trade, but had given much attention to experimenting in making sewing machines from that time (1841) to 1847; and that previous to 1847 he had perfected a number of machines, four at least, and had put them in use; that early in the year 1847 he had made. specifications for one of them, and this specification (a copy of which is said to be before the court) is dated July 7, 1847.

He says he made a machine like it before that date; that a number of them were used; one was used by a tailor in the interior of New York, carrying on his trade, from whom he expected to obtain money to procure a patent. but he did not succeed in getting it; that he made arrangements, he said, with a friend of his to furnish him money to procure a patent, but that failed. It is a little singular that if he had at that time been the inventor of the machine, a small model of which has been before the court, certainly a very superior piece of mechanism, exhibiting great ingenuity, evidently containing all the elements of this automatic feed of Wilson, that no one could be found who would advance the necessary funds, thirty, forty, or fifty dollars, to procure a patent. Nothing, however, seems to have been done in any manner by him until eleven years afterward, in 1858. His excuse for this long delay is, that a great fire happened in Albany soon after he had got his papers and model partially prepared, which destroyed his property; and he had supposed his drawings were all lost, and did not find them until some time in 1858, after he had removed to the city of New York, when, in looking over a box. to use his own phrase, containing some old trumpery, he found this first drawing, from which, he says, he copied the one sent to the patent office, a copy of which is before the court. The inquiry might, perhaps, suggest itself—Where had this old box of trumpery been all this time? How came these drawings, so very valuable, the only ones he had, to remain there unexhumed for a period of eleven years? No explanation is given, and we are left to conjecture. In 1858 he filed his drawings in the patent office, which, he says. were copied from this original draft he found in this box, which he made in 1847, and asked for a patent. but, singularly, not for an improvement in the feed-motion of sewing machines, but for an alleged improvement in the bobbins of a sewing machine, an entirely

different thing from this; his specification does not indicate any thing of this kind. A copy of that application is before the court, furnished by the defendant, that describes it as being an application for an improvement in bobbins. Now, if his attention had been given from 1841 to 1847 to improvements in sewing machines, and if he really had invented this invaluable feed, which has done so much to improve these machines, creating such an immense amount of litigation throughout the country, it is hardly conceivable that he waited from 1841 to 1858, found his old drawings, and then only asked for an improvement in bobbins.

The story is incredible. Mr. Marsh's affidavit is relied upon to sustain Mr. Ellithorpe. It seems from Mr. Marsh's testimony that he was living in Albany about the same period of time, from 1841 to 1847, and he was an apprentice to the watchmaking business. He says he saw some drawings sometime before 1847, which Ellithorpe had made, and from his recollection, they are substantially like the ones that are now in the patent office. Well, that certainly is very vague, inconclusive, and uncertain. The idea that he, not being a machinist or expert, and knowing nothing about sewing machines himself, could carry in his mind twelve or fifteen years what the peculiar character of those drawings were, is hardly credible. But he says further, that he remembers seeing a model which he says is similar to the one that is exhibited in this case, and which he (Ellithorpe) made at that time; that he (Marsh) remembers making the brass spiral wire for it, and putting it into it. A number of suggestions are brought to the mind in relation to this part of the testimony; presuming Mr. Marsh to be an honest witness, and the court does not intend to question that. If Ellithorpe made such a model as that at that time, where has it been? They do not claim that that was burned in the building. The first we hear of the model is now. Where has that slept for fifteen years? The truth is, and it is useless to disguise it, this whole affair of Ellithorpe's resembles very much an entire after-thought for defeating the orators in their just rights, if they have any, and can not, in my view of the case, with this evidence, be regarded favorably at all.

It is again claimed that the Bachelder machine, known as the "wheel-feed machine," which Bachelder in his affidavit states was put in use in January, 1849, and was patented in May, 1849, is prior to Wilson's invention, and defeats his claim of novelty, and that that question has not been before passed upon by any court. There are three difficulties in sustaining this position. The first is, that it does not appear that this invention of Bachelder was prior to Wilson. Bachelder states that this machine was built as early as January, 1849, but it is not pretended that it was used before that date, while Wilson's invention goes back into 1848. In the case of Potter

v. Wilson [supra], Nelson, Circuit Justice, says: "The proof is very full and satisfactory that the invention of Wilson was so far matured as to admit of sewing curved seams by way of experiment as far back as 1848." This opinion, it should be remembered, was pronounced after a very long hearing, as before stated, and a large amount of testimony pro and con. Again, it does not appear when the machine, of which Exhibit J. B. is a copy, was first constructed. It is claimed by Bachelder in his affidavit to be described in his application for a patent, December 27, 1848. But it seems from his own statement, that he had used various feed motions for his machines previous to that time (I think at least six are described by him, all differing each from the other); that at one time he used sand-paper; at another time he used dog-fish skin. These he called his "rough-surface feeds." And he states that as late as November, 1850, he made an application for a patent for this rough-surface feed, for an improvement upon his original machine, and that at a public exhibition in Boston in 1850, he exhibited a machine with a dog-fish skin rough-surface feed, and received a medal therefor. In what season of the year that exhibition was, the affidavit does not state, but probably it was in the autumn. Now, it should be borne in mind that this exhibit (J. B.) of the defendant, is a very ingenious machine, and as it was worked in presence of the court, does sew seams of nearly any desirable curvature; and I apprehend it can not be contended by any one but that it is infinitely preferable to any of Batchelder's rough-surface feed machines. Then, if Bachelder had, previous to this time (1850), when he presented his dog-fish skin rough-surface machine in Boston, and November, 1850, when he asked for a patent for that as an improvement upon his previous machine, for which he had got his patent, for which he applied in December, 1848; I say, if he had, previous to this time invented and put in operation a machine that worked so well and effectively, as an examination of Exhibit J. B. shows that it does, it is inconceivable that he should have exhibited at fairs, and made models of machines with dog-fish skin rough-surface, and afterward have applied for a patent for that as an improvement upon his previous patent. It should be noticed that Bachelder does not pretend to say when this machine, exhibited in court, was made. He says himself, that it is made in accordance with one of his claims; but for the reasons I have already assigned, I can hardly come to that conclusion. Bachelder's drawings were not furnished the court. They were here on the trial; but on looking for them among the papers, I could not find them. Again, one or more of the Bachelder machines, his drawings and patents, have heretofore been before the court, were presented in Connecticut and at Cooperstown, and they have been passed upon. The court, in both instances, decided that they did not

interfere, or in any way affect the validity of Wilson's patents, and could not be set up against them on that ground. For these reasons I think that this objection of the defendant can not be sustained

The defendant presents another reason why this injunction should not issue. He says that the machines of Williams and Orvis, which are sold by the defendant Fuller, do not infringe upon either of Wilson's reissued patents. Now, whether they do or do not, depends very much upon the construction that is to be given to those reissues. If the court should give to those reissued patents the limited and narrow construction claimed for them by the defendant's counsel, I am inclined to think that that position, perhaps, could be maintained. If, on the other hand, this court, on this question of preliminary injunction, follows the decision of Judge Ingersoll, and the full bench at a subsequent period, in relation to these same patents, it is very clear that the Williams and Orvis machines do infringe these reissued patents; and in truth it is hardly contended by the counsel for the defendant, that they do not. It seems to have been conceded by the principal argument made on behalf of the defendant, that if the decision of Judge Ingersoll, which was subsequently adopted and sustained by Judge Nelson, is a sound construction of those patents, that this is an infringement of Wilson's patent; but the attempt was made to show that both courts had committed several errors in the construction of those patents. I have said all I care to say upon that branch of the case. Much time was spent in the argument upon this very thing, more than upon any other; much ingenuity and nice criticism. But it should be borne in mind, and probably was known by some of the defendant's counsel, that there was no criticism urged before this court that was not urged with equal ingenuity and zeal and force before the court at Cooperstown. I have compared the briefs upon that subject, and I find that these questions were there presented and all have been passed upon. Justice Nelson, in the conclusion of his opinion in the case of Potter v. Wilson, says:

"3. An objection is also taken that the defendant's machines do not infringe the improvement of the feed motion of Wilson.

"The leading original idea of Wilson, and which he has embodied into his improvement, is the substitution of the two surfaces between which the cloth is clasped or held, for the baster-plate of previous machines, and so arranging these two surfaces that one of them, by an automatic intermittent motion of one or both, would advance the cloth to the needle, and at the same time admit of its being turned by the hand so as to sew curved seams. Now, it is quite clear that this conception, which has remedied a great defect in previous machines by getting rid of the frame upon which the cloth was fastened, and which could move only with the frame or baster-plate, and hence, practically, could sew straight seams and fixed curves only, was capable of being embodied into a working machine in various modes and forms. A skillful mechanic, by mere skill, and without the use of the inventive faculties, could embody it and adapt it to practical use by different mechanical devices. This requires ingenuity simply, not invention. But so long as Wilson's ideas are found in the construction and arrangement, no matter what may be its form or shape or appearance, the party using it is appropriating his invention, and must be held an infringer; and within this view we are satisfied the machines of the several defendants must be regarded violations of the patents in question."

It can hardly be expected, these questions having already been settled by the highest judicial tribunal in the Southern district of New York, that I should on a question of preliminary injunction, attempt to overrule it. If that decision at Cooperstown was wrong, the defendants could have carried it up; and it will not be pretended that that was a collusive case: it was fought too earnestly. I might almost say, bitterly. But they chose to settle down under the decision of the court, making it a perpetual injunction upon the hearing in chief. If, upon this case, after they have a hearing in chief, the court should again take the same construction of these reissued patents that has been before taken, then there is an appeal to a higher tribunal; but until that time comes, all the courts of this district will—and most certainly I shall—feel bound by this decision. The consequence is, the injunction must issue according to the prayer of the bill.

[For other cases involving this patent, see note to Potter v. Whitney, Case No. 11,341.]